UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ALOYSIUS DREAMING BEAR, | ) | CIV. 10-5030-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DISMISSING |
| vs. | ) | COMPLAINT AND DENYING |
| | ) | PLAINTIFF'S MOTION FOR |
| BERLINE FLEMING, | ) | PRELIMINARY AND |
| BONNIE ANDERSON, | ) | PERMANENT INJUNCTION |
| JOHN COPE, | ) | |
| LANCE TLUSTOS, | ) | |
| LISA LOCKHART, and | ) | |
| LAWRENCE JASKE, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

On May 3, 2010, plaintiff Aloysius Dreaming Bear, a Lakota student and graduating senior at Oelrichs High School, brought suit against the members of the school board and the superintendent of the school district. (Docket 1). Mr. Dreaming Bear alleges defendants violated his right to free speech under the First Amendment by requiring him to wear a cap and gown over his traditional Lakota clothing at the 2010 graduation proceedings. Id. at ¶ 9. Mr. Dreaming Bear seeks a preliminary and permanent injunction enjoining defendants from imposing the cap and gown policy on him and other Lakota students at the 2010 and all future graduation events. Id. at p. 3. Mr. Dreaming Bear also seeks an award of nominal damages and the costs of the action, including reasonable attorney's fees. Id. Also pending before the court is Mr. Dreaming Bear's motion for preliminary and permanent injunction.

(Docket 6).  Defendants resist Mr. Dreaming Bear's complaint and motion for injunctive relief.  (Docket 21).  The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1343(3).  This matter is ripe for adjudication.

## FACTS

The court held a hearing on Mr. Dreaming Bear's request for injunctive relief on May 13, 2010.[1]  Three witnesses testified at the hearing: Mr. Dreaming Bear; Elizabeth Cook-Lynn, poet, writer, and professor; and Charles Fredrickson, principal of Oelrichs High School.  From the evidence and testimony presented at the hearing, the court adduces the following facts.

Mr. Dreaming Bear is a 19-year-old senior at Oelrichs High School located in Oelrichs, South Dakota.  He has attended Oelrichs High School since the second semester of his freshman year.  He is the president of the senior class comprised of 10 students.  The 2010 graduation proceedings are scheduled for May 22, 2010.

Oelrichs High School is a public high school within Oelrichs School District No. 23-3.  The school board operates the district.  Berline Fleming is the president of the school board, Bonnie Anderson is the vice president, and John Cope, Lance Tlustos, and Lisa Lockhart are members of the school board.  Dr. Lawrence Jaske is the superintendent of the school district.

---

[1]At the conclusion of the hearing, the court urged the parties to engage in settlement negotiations for amicable resolution of the issues.  The court twice extended the deadline for the conclusion of settlement negotiations.  On May 18, 2010, the parties advised the court they were unable to reach a settlement.  Accordingly, the court issued this opinion.

Mr. Dreaming Bear is a lifelong resident of the Pine Ridge Indian Reservation and is a member of the Oglala Sioux Tribe. He is Lakota and a seventh-generation descendent from Chief Red Cloud. Lakota culture has played an important role in Mr. Dreaming Bear's life, and he identifies himself as a Lakota man who takes pride in who he is and where he comes from.

At the beginning of the school year, Mr. Dreaming Bear informed his class sponsor of his intent to wear traditional Lakota regalia and clothing at his graduation. The sponsor informed Mr. Dreaming Bear he could do so because it was the students' graduation. Mr. Dreaming Bear then learned the school board required him to wear a cap and gown over his traditional clothing. As a result, Mr. Dreaming Bear asked his mother to place him on the agenda for the school board meeting to be held on April 12, 2010.

Mr. Dreaming Bear obtained the signatures of nine seniors who supported his decision to wear traditional Lakota clothing instead of a cap and gown. (Exhibit 3).[2] The remaining senior indicated she did not know.[3] Id.

Prior to the school board meeting, Mr. Dreaming Bear prepared a letter articulating his thoughts and position on the issue. (Exhibit 2). The meeting began at approximately 7 p.m. on April 12, 2010. When called, Mr. Dreaming Bear started to read the letter to the school board; however, he was not allowed

[2]Unless otherwise noted, the exhibits referenced throughout this opinion were admitted into evidence at the May 13, 2010, hearing.

[3]It is unclear when Mr. Dreaming Bear obtained the signatures. He testified he did not have the opportunity to provide the list at the school board meeting because he was cut off. Thus, it would appear he obtained the signatures sometime before the school board meeting on April 12, 2010.

to finish because he was told his three minutes had expired.  Mr. Dreaming Bear was never told he had only three minutes to speak at the meeting.

Later that evening, the school board informed Mr. Dreaming Bear of its decision requiring him to wear a cap and gown over his traditional Lakota clothing.  However, the school board clarified Mr. Dreaming Bear would need to wear a cap and gown *only* as he walked across the stage to receive his diploma; once he received his diploma, he immediately could remove the cap and gown as he exits the stage and hang it in an area provided for that purpose.  The school board informed Mr. Dreaming Bear all graduating students must wear a cap and gown when receiving their diploma.  Nine of the ten graduating seniors are Lakota.

Oelrichs High School issues a student-parent handbook.  (Exhibit 4).  Each student signs a form acknowledging receipt of the handbook.  Mr. Dreaming Bear testified he signed the form (Exhibit 5), but did not agree with all of the handbook's provisions.  The handbook provides the following description of the graduation proceedings:

> Graduation is traditionally held on the third or fourth Saturday of May.  The students of the class will take an active role in planning their graduation.  The standards of good taste and dignity will be the rule for this activity.  The class should decide on the class sponsors, colors, cap & gowns, class motto, class officers, commencement speaker, and the guides and ushers.

> The valedictorian and salutatorian will have the opportunity of addressing the class at the graduation exercise.  Their class sponsor will work with them on their presentation and approve it with the principal.

(Exhibit 4 at p. 6).

Mr. Dreaming Bear testified he considered the graduation to be the students' event, and, thus, he should be allowed the wear the clothing of his choice. Mr. Dreaming Bear testified he was acting on behalf of future generations as it was important to him as a Lakota warrior to protect his people and stand up for what is right.

Charles Fredrickson, principal of Oelrichs High School, described the planned May 22, 2010, graduation exercises. Mr. Fredrickson has been an educator and administrator for approximately 25 years and has been the principal in several tribal schools. Dr. Lawrence Jaske, superintendent of Oelrichs School District, filed an affidavit also describing the graduation proceedings. (Docket 21, Exhibit A). The court also reviewed a copy of the last working draft of the graduation program. (Exhibit 101).

All of the events associated with the graduation, including the feather and plume and star quilt ceremonies, will occur in the school's gymnasium in full view of the audience. A portable stage will be used when handing out the diplomas, with chairs set up in front of the stage for the audience. The proceedings will begin at 1 p.m. with a feather and plume ceremony. The graduating seniors are encouraged to wear traditional native clothing and regalia. A holy man or medicine man will bless the feathers and plumes. Honoring songs may be sung at this time. Each graduating senior is called to the front of the gymnasium where a person of the student's choice, generally a parent or guardian, will tie onto the student a feather (for a male student) or plume (for a female student). This ceremony may last an hour or longer. The

purpose of this traditional Lakota ceremony is to acknowledge the accomplishments of the graduating seniors.

After the feather and plume ceremony, the graduating seniors will exit the gymnasium and then re-enter as a unified class wearing caps and gowns. They will be seated with kindergarten and eighth grade students. After the welcoming address by Dr. Jaske, Mr. Chris Eagle Hawk will offer a prayer. The kindergarten and eighth grade students will then be "promoted." The valedictorian and salutatorian will speak briefly, scholarships will be awarded, and a speaker will provide the commencement address, followed by a senior slide show.

Each senior is presented to the audience individually to receive his or her diploma from the school board president. The student will cross the stage in a cap and gown, receive his or her diploma, and exit the stage, removing and hanging up the cap and gown if desired. The student then will be honored with a star quilt and may be wrapped in the quilt if desired.[4] The star quilt ceremony will take place in the center aisle directly in front of the stage, again in full view of the audience. There is no set time limit for the star quilt ceremony as it will depend on the number of quilts each student will receive from family members and friends. Once the student is honored by the star quilt(s), the next student will be presented and will walk across the stage to receive his or her diploma and then the star quilt(s). Mr. Dreaming Bear will be required to wear a cap and gown over his traditional regalia for a total of

---

[4]The school board approved the star quilt ceremony after printing the draft program, thus, Exhibit 101 does not reference the ceremony.

approximately 30 minutes. The graduation proceedings are expected to last at least two hours and perhaps longer.

Students who do not wear the cap and gown will still obtain their diploma; however, it is unclear if those students will be allowed to participate in the graduation events. Mr. Fredrickson testified the cap and gown are symbols of the students' academic achievement and of their readiness to move forward in life. The cap and gown are "academic measures of recognition" and are symbolic of the unity of the 2010 graduating class. Mr. Fredrickson acknowledged Mr. Dreaming Bear's message is important, yet noted the school board's message in honoring academic achievement is also important.

Mr. Dreaming Bear testified he did not learn of the feather and plume and star quilt ceremonies until recently and sometime after his appearance before the school board on April 12, 2010. Dr. Jaske asked Mr. Dreaming Bear to participate in planning the ceremonies, but Mr. Dreaming Bear did not. Mr. Dreaming Bear understood the significance of the ceremonies. The ceremonies honor individuals who have attained significant achievement. Mr. Dreaming Bear acknowledged the school board has an interest in organizing and running the graduation proceedings. He also acknowledged the audience would see him for most of the planned proceedings garbed in his traditional Lakota clothing and would recognize his pride in his people and culture. Mr. Dreaming Bear recognized a cap and gown are universal symbols of learning, achievement, and academic success, but pointed out traditional Lakota clothing is as well.

Mr. Dreaming Bear testified he saw no difference in the symbolism of wearing a cap and gown or traditional Lakota clothing when receiving his diploma as both represent academic achievement.  Yet, he maintained he should be allowed to receive his diploma without wearing a cap and gown over his traditional Lakota clothing.  Mr. Dreaming Bear indicated his position remained unchanged even though the feather and plume and star quilt ceremonies were added to the graduation proceedings.

Professor Elizabeth Cook-Lynn testified as to the importance of culture and heritage to Lakota people.  Professor Cook-Lynn is a poet, writer, professor emerita of English and Native American Studies at Eastern Washington University, and a visiting professor at the University of California at Davis.[5] She is Santee and Yankton Dakota.  Professor Cook-Lynn testified traditional clothing is a tribal symbol and personal obligation.  A high school graduation is of ceremonial significance to a Lakota person.  She stated ceremonial life expresses who a native person is and where he or she comes from.

Professor Cook-Lynn expressed no objection to the feather and plume and star quilt ceremonies.  Indeed, she believed these ceremonies were a "good start," although not a "good ending."  Nor did she object to the wearing of a cap and gown, acknowledging they are universal symbols of high honor and academic achievement.  Professor Cook-Lynn's only objection was that Mr. Dreaming Bear cannot express his connection to his tribe and people as he

---

[5]Professor Cook-Lynn provided the court with a list of her publications. (Docket 8).  She also filed an affidavit for the consideration of the court.  Id.

wishes.  Professor Cook-Lynn stated traditional Lakota dress has the same

significance as a cap and gown.  She opined the school board's cap and gown

policy sends a message that Lakota dress is an inferior way to signify

achievement.

## DISCUSSION

The court considers the parties' arguments within the context of Fed. R.

Civ. P. 65 and the law on injunctive relief.  A preliminary injunction is an

extraordinary remedy, and the burden is on the movant to show relief should

issue.  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citations

omitted).

The district court has sound discretion to grant or deny such relief.

Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 n. 8 (8th Cir.

1981) (*en banc*).  When determining whether to grant or deny a motion for

preliminary injunction, the court weighs four factors: (1) the threat of

irreparable harm to the movant; (2) the state of balance between this harm and

the injury that granting the injunction will inflict on other parties to the

litigation; (3) the movant's probability of success on the merits; and (4) the

public interest.[6]  Id. at 113.  No single factor is dispositive, rather "all of the

---

[6]The standard for the issuance of a permanent injunction is the same as
that for a preliminary injunction except the movant must show actual success
on the merits.  Oglala Sioux Tribe v. C & W Enterprises, Inc., 542 F.3d 224,
229 (8th Cir. 2008).  "If a court finds actual success on the merits, it then
considers the following factors in deciding whether to grant a permanent
injunction: (1) the threat of irreparable harm to the moving party; (2) the
balance of harms with any injury an injunction might inflict on other parties;
and (3) the public interest."  Id.

factors must be considered to determine whether on balance they tip towards granting injunctive relie[f]." Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd., 824 F.2d 665, 667 (8th Cir. 1987) (citing Dataphase Systems, Inc., 640 F.2d at 113). However, because the third factor–the probability of success on the merits–is the most significant, the court will address it first. Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995); S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).

## A.     The Movant's Probability of Success on the Merits

Mr. Dreaming Bear seeks injunctive relief based solely on the Free Speech Clause of the First Amendment. (Dockets 1, 6, & 22). The First Amendment protects not only verbal and written expression, but also symbols and conduct that constitute symbolic speech. Littlefield v. Forney Independent School Dist., 268 F.3d 275, 282 (5th Cir. 2001) (citing Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 505-06, (1969)). The First Amendment inquiry is two-fold. Zalewska v. County of Sullivan, New York, 316 F.3d 314, 319 (2d. 2003). First, the court must determine whether Mr. Dreaming Bear's actions would constitute expressive conduct to warrant First Amendment protection. Id. Second, the court must determine whether the school board's cap and gown policy impermissibly denies such protection to Mr. Dreaming Bear. Id. (citing Texas v. Johnson, 491 U.S. 397, 403 (1989)).

1. **Whether Mr. Dreaming Bear's Wearing of Traditional Lakota Clothing Would Constitute Expressive Conduct**

   a. **Case Law on Expressive Conduct as Protected Speech**

As a threshold matter, the court must determine whether the protections of the First Amendment, as incorporated and applicable to states through the Fourteenth Amendment, apply to this case. The protections of the First Amendment generally do not apply to conduct in and of itself. Blau v. Fort Thomas Public School Dist., 401 F.3d 381, 388 (6th Cir. 2005). The Supreme Court has rejected the notion that " 'an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea[.]' " Johnson, 491 U.S. at 404 (quoting United States v. O'Brien, 391 U.S. 367, 376 (1968)). Rather, conduct must be "sufficiently imbued with elements of communication" to be entitled to First Amendment protection. Id. (citing Spence v. Washington, 418 U.S. 405, 409 (1974)). Courts must also consider the context in which symbolic conduct is used, for the context may give it its meaning. Spence, 418 U.S. at 410.

To sustain a free-speech claim involving conduct, a court must determine whether the claimant has shown an intent to convey a particularized message and whether the likelihood is great the message will be understood by those who view it. Blau, 401 F.3d at 388 (citing Spence, 418 U.S. at 411; Johnson, 491 U.S. at 404). "The threshold is not a difficult one, as 'a narrow, succinctly articulable message is not a condition of constitutional protection.' " Id. (quoting Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,

515 U.S. 557, 569 (1995)). Yet, the First Amendment requires more than vague and attenuated notions of expression. Id. at 390. The requirements are modest for bringing an expressive-conduct claim within the umbrella of the First Amendment. Id. However, at a minimum, the claimant must show his conduct can fairly be described as " 'imbued with elements of communication' " which convey a particularized message understood by the viewers. Id. (quoting Johnson, 491 U.S. at 406; Spence, 418 U.S. at 411). The burden is on Mr. Dreaming Bear as the movant to demonstrate his intended conduct falls under the umbrella of protection of the First Amendment. Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294 n. 5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.").

In Zalewska, the Court of Appeals for the Second Circuit considered a First Amendment challenge to a municipal transit authority's dress code which mandated all employees wear pants as part of a driver's uniform. 316 F.3d at 317. Claimant, a female van driver, desired to wear a skirt, having never worn pants as a matter of familial and cultural custom. Id. She claimed wearing a skirt was an expression of a deeply held cultural value. Id. at 318. The court discussed the importance of clothing as a means of communication:

> We realize that for Zalewska–as for most people–clothing and personal appearance are important forms of self-expression. For many, clothing communicates an array of ideas and information about the wearer. It can indicate cultural background and values, religious or moral disposition, creativity or its lack, awareness of current style or adherence to earlier styles, flamboyancy, gender identity, and social

status.  From the nun's habit to the judge's robes, clothing
may often tell something about the person so garbed.

Id. at 319.  Yet, the court recognized the First Amendment did not protect all

forms of communication:

> [T]he fact that something is in some way communicative does not
> automatically afford it constitutional protection. . . .
>
> To determine whether conduct is expressive and entitled to
> constitutional protection requires an inquiry into whether the activity
> is sufficiently imbued with the elements of communication to fall
> within the scope of the First and Fourteenth Amendments, for not all
> conduct may be viewed as speech simply because by her conduct the
> actor intends to express an idea.  To be sufficiently imbued with
> communicative elements, an activity need not necessarily embody a
> narrow, succinctly articulable message, but the reviewing court must
> find, at the very least, an intent to convey a particularized message
> along with a great likelihood that the message will be understood by
> those viewing it.

Id. (internal citations and quotation marks omitted).

The court in Zalewska found the message claimant intended to convey

was not specific or particularized, but rather was a broad statement of cultural

values.  Id.  The court characterized claimant's actions as an attempt to

communicate a vague and unfocused message, that is, a "vague, overarching

view of cultural tradition," which was afforded "minimal if any First

Amendment protection."  Id. at 319-20.  The court also found claimant's

message could not be understood readily by viewers since "no particularized

communication can be divined simply from a woman wearing a skirt."  Id. at

320.  "Essential to deciding whether an activity carries a perceptible message

entitled to protection is an examination of the context in which the activity was

conducted." Id. (citing Johnson, 491 U.S. at 405). On this issue, the court

offered the following useful analysis:

> The Supreme Court has been careful to distinguish between communicative activity with a clear contextual message, such as the wearing of a black armband in protest during the Vietnam War, compared with other types of activity, like choosing what to wear in the ordinary course of employment. The statement in *Tinker*–that regulation of length of skirts or type of clothing, . . . hair style, or deportment is different from that sort of regulation that involves direct, primary First Amendment rights akin to pure speech– suggests that a person's choice of dress or appearance in an ordinary context does not possess the communicative elements necessary to be considered speech-like conduct entitled to First Amendment protection.

Id. (internal citations and quotation marks omitted). The court concluded

claimant's conduct, though expressive, did not implicate the First Amendment

because the ordinary viewer would not glean a particularized message from

claimant's wearing of a skirt as part of her uniform instead pants. Id. The

court noted a woman in contemporary society would not automatically signal

any particularized message about her culture or beliefs by wearing a skirt or

dress. Id.; see also East Hartford Ed. Ass'n v. Board of Ed. of Town of East

Hartford, 562 F.2d 838, 856-60 (2d Cir. 1977) (in considering a First

Amendment challenge to a public school board's dress code requiring male

teachers to wear neckties, the court found claimant's message of non-

conformity and rejection of older traditions, as expressed through his refusal to

wear a necktie, was sufficiently vague to allow the school board to regulate it

without running afoul of the First Amendment).

The <u>Zalewska</u> court cited with approval <u>Doe ex rel. Doe v. Yunits</u>, No. 001060A, 2000 WL 33162199 (Mass. Super. Oct.11, 2000), a state court case from Massachusetts. The court noted <u>Yunits</u> was not binding, yet found the case illustrative of "contexts in which a particular style of dress may be a sufficient proxy for speech to enjoy full constitutional protection." <u>Zalewska</u>, 316 F.3d at 320. In <u>Yunits</u>, the state court enjoined a public high school from prohibiting the enrollment of a male student who wanted to attend school wearing female clothes and accouterments. 2000 WL 33162199 at *1. The court found claimant's conduct to be expressive speech entitled to protection. The court determined claimant, by wearing female clothing and accessories, intended to convey a particularized message, namely her identification with the female gender. <u>Id.</u> at *3. Further, the court found claimant's ability to express her gender identity through dress was important to her health and well-being and "a necessary symbol of her very identity." <u>Id.</u> This elevated the issue above a desire to express one's personal preference. <u>Id.</u> (contrasting <u>Olesen v. Board of Education of School District No. 228</u>, 676 F. Supp. 820 (N.D. Ill. 1987) (school's anti-gang policy of prohibiting males from wearing earrings, passed for safety reasons, was upheld because plaintiff's desire to wear an earring as an expression of his individuality and attractiveness to girls was a message not within the scope of the First Amendment)). The court also found viewers–the school faculty and students–would understand claimant's message because it was such a break from the norm. <u>Id.</u> at *4 (citing <u>Bivens v. Albuquerque Public Schools</u>, 899 F. Supp. 556 (D. N.M. 1995) (student failed to

15

provide evidence that his wearing of sagging pants to express his identity as an African-American youth was understood by others and, therefore, such attire was not speech)).

The Court of Appeals for the Sixth Circuit reached the opposite conclusion in Blau, 401 F.3d 381. The court considered a First Amendment challenge to a public school's dress code. Id. at 386. Claimant, a middle school student, opposed the dress code because she wanted to wear clothes that looked nice on her, made her feel good, and expressed her individuality. Id. Claimant stated she had no particular message she wished to convey through her clothing. Id. Nor did she feel the dress code was incompatible with any personal religious beliefs. Id.

The court recognized the importance of clothing as a means to express individuality, but found claimant could not meet "the modest requirements for bringing an expressive–conduct claim within the umbrella of protection provided by the First Amendment[.]" Id. at 390. "[T]he First Amendment does not protect such vague and attenuated notions of expression–namely, self-expression through any and all clothing that a 12-year old may wish to wear on a given day." Id. The court concluded claimant's desired conduct did not even implicate the First Amendment. Id.; see also Stephenson v. Davenport Community School Dist., 110 F.3d 1303, 1307 n. 7 (8th Cir. 1997) (in rejecting claimant's First Amendment challenge to a school's regulation of gang-related activities, including the display of colors, symbols, and signs, the court found claimant's conduct in obtaining a tattoo did not warrant First

Amendment protection when claimant admitted the tattoo was simply a form of self-expression).

In comparison, in <u>A.A. ex rel. Bettenbaugh v. Needville Independent School Dist.</u>, ___ F. Supp. 2d ___, 2009 WL 6318214 (S.D. Tex. Jan. 20, 2009), the district court entertained a challenge to a school district's exemption policy created specifically for claimant, a Native American student. The school district had a grooming policy requiring male students to maintain their hair in such a way as to not cover any part of the ear or touch the top of a standard collar in the back. <u>Id.</u> at *3. The exemption policy to this grooming code required claimant to wear his long hair in a single, tightly woven braid stuffed down the back of his shirt. <u>Id.</u> at *3-6. Claimant challenged the exemption requirement on the basis of the Free Exercise Clause and, applicable to this discussion, the Free Speech Clause of the First Amendment. <u>Id.</u> at *1, *17.

The court considered the context in which claimant's conduct occurred. <u>Id.</u> at *18 (citing <u>Johnson</u>, 491 U.S. at 405). The court found claimant's braids conveyed a particularized message about his Native American heritage and religion. <u>Id.</u> The court heard testimony that it was common for Native American men to wear their hair long and in braids as part of the decolonization process. <u>Id.</u> Claimant assigned symbolic meaning to his braids as an outward expression of his heritage and ancestry. <u>Id.</u>

The court also found members of the school community were likely to understand the meaning of claimant's braids. <u>Id.</u> The court noted a predominant image of Native Americans in pop culture was the sight of Plains

Indians wearing their hair in long braids.  Id.  There were photographs on the walls of the school depicting Native Americans wearing their hair long and in braids.  Id.  Given these depictions, and the fact that claimant's father also wore his hair in long braids, the court found teachers and students would likely understand claimant's braids reflected his Native American heritage.  Id.  The court concluded claimant's conduct possessed "sufficient communicative elements to warrant First Amendment protection[.]"  Id. (citing Johnson, 491 U.S. at 404); see also Tinker, 393 U.S. at 505-14 (holding a school district could not prevent students from wearing black arm bands when doing so conveyed an unmistakable message about the Vietnam War, a contemporaneous issue of intense public concern); Spence, 418 U.S. at 410-11 (holding a public school could not prevent a college student from hanging a flag with a peace sign upside down in his dormitory room window as a "pointed expression of anguish" about the current affairs of the government); Chalifoux v. New Caney Indep. School Dist., 976 F. Supp. 659, 664-65 (S.D. Tex. 1997) (finding the wearing of rosary beads by students in a public school was symbolic speech when the students intended to communicate their Catholic faith and observers were likely to understand their message).

In Canady v. Bossier Parish School Bd., 240 F.3d 437 (5th Cir. 2001), the Court of Appeals for the Fifth Circuit considered a challenge to a school board's mandatory uniform policy.  The court considered whether a person's choice of attire qualified as protected speech under the First Amendment.  Id. at 439.  The court found "[w]hile a person's choice of clothing may be

predicated solely on considerations of style and comfort, an individual's choice of attire also may be endowed with sufficient levels of intentional expression to elicit First Amendment shelter."[7] Id. at 440. The court's discussion on this issue is instructive:

> A person's choice of clothing is infused with intentional expression on many levels. In some instances, clothing functions as pure speech. A student may choose to wear shirts or jackets with written messages supporting political candidates or important social issues. Words printed on clothing qualify as pure speech and are protected under the First Amendment.

> Clothing may also symbolize ethnic heritage, religious beliefs, and political and social views. Individuals regularly use their clothing to express ideas and opinions. Just as the students in *Tinker* chose to wear armbands in protest of the Vietnam War, students may wear color patterns or styles with the intent to express a particular message. The choice to wear clothing as a symbol of an opinion or cause is undoubtedly protected under the First Amendment if the message is likely to be understood by those intended to view it.

> Finally, students in particular often choose their attire with the intent to signify the social group to which they belong, their participation in different activities, and their general attitudes toward society and the school environment. While the message students intend to communicate about their identity and interests may be of little value to some adults, it has a considerable affect, whether positive or negative, on a young person's social development. Although this sort of expression may not convey a particularized message to warrant

---

[7]The Supreme Court in Tinker was careful to distinguish the wearing by students of black arm bands in political protest of the Vietnam War, which the Court characterized as "akin to 'pure speech'" from the "regulation of the length of skirts or the type of clothing, to hair style, or deportment." Tinker, 393 U.S. at 507-08. The Fifth Circuit rejected any interpretation of this statement as holding that clothing may never qualify as protected speech. Canday, 240 F.3d at 440 n. 1. The Canady court announced its preference for the "contemporary test for assessing expressive conduct outlined in Spence and Johnson." Id.

First Amendment protection in every instance, we cannot declare that
expression of one's identity and affiliation to unique social groups
through choice of clothing will never amount to protected speech.

Id. at 440-41 (internal citations and footnotes omitted).  Thus, the court

rejected a blanket rule that clothing did not contain sufficient communicative

content as to fall under the umbrella of protected speech.  Id. at 441.

### b.   Application to Mr. Dreaming Bear's Case

Clearly, under most circumstances, one's choice of clothing is no more or

less than an expression of individuality and general sense of self.  However,

within certain contexts, the act of choosing clothing is elevated above the norm

to become the type of expressive speech contemplated by the First Amendment.

The court finds this is one such case.

Mr. Dreaming Bear testified at length as to the importance of  Lakota

culture to his identity and well-being.  The sentiments expressed in the letter

he drafted to read at the school board meeting (Exhibit 2) mirrored his live

testimony.  It is clear to the court that, for Mr. Dreaming Bear, wearing

traditional Lakota clothing and regalia when receiving his diploma is much

more to him than a mere fashion choice or a way to distinguish himself from

other students.  Mr. Dreaming Bear sees himself as a Lakota warrior who takes

pride in who he is and where he comes from.  Clothing is an integral part of his

identity.  The court cannot express this concept better than

Mr. Dreaming Bear himself:

I can only speak for myself and say that it is only me as a single
individual that wishes to wear my traditional clothing for graduation
and all the other seniors are going to wear caps and gowns.  To me

20

my culture and people mean a lot, in the Lakota culture a man was suppose [sic] to protect his people and stand for what is right! That is one of the base reasons why I come here to face you the school board, because I am protecting my people by coming here to face you, and protect my cultures [sic] heritage by standing up for what is right and that is me wear my tribes [sic] traditional clothing with pride on graduation day, because *how can I be a[n] honorable Lakota warrior by wearing a white mans [sic] gown, and not my tribes [sic] regalia?*
. . . .
I have a lot of respect for the American culture and the American military, BUT that is not where I come from[.] I come from the Oglala Sioux Tribe, and my ancestors have fought many battles and wars with the wasicu people just so that I can stand here in confidence and respect for my people and honor what my people gave their lives for and that is our heritage, our culture, our beliefs, our language, and most of all our pride, and *I can only see me honoring them by wearing what I wish to wear in making it through a white man's education, by graduating high school.*

(Exhibit 2 at pp. 1-2) (emphasis added).

In wearing traditional Lakota clothing as he receives his diploma, Mr. Dreaming Bear evinces an intent to convey a particularized message–he is a Lakota man honoring his people and his heritage during a special event in his life. This message is akin to the wearing of braids as an expression of a student's cultural identity or the wearing of female clothing as an expression of a student's gender identity. See A.A. ex rel. Bettenbaugh, 2009 WL 6318214; Yunits, 2000 WL 33162199. Mr. Dreaming Bear's conduct contrasts sharply with the student in Blau, for example, who wanted to wear clothes that looked nice on her, made her feel good, and expressed her individuality. 401 F.3d 381.

Further, the likelihood is great Mr. Dreaming Bear's message will be understood by those viewing it–teachers, parents, students, and other

spectators at the graduation exercises.  Nine of the ten graduating seniors are Lakota; it stands to reason their family members will constitute a significant segment of the audience.  Clearly, the teachers and school administrators understand the significance of certain Lakota traditions as evidenced by the inclusion of the feather and plume and star quilt ceremonies at the graduation proceedings.  If Mr. Dreaming Bear were to appear in traditional Lakota dress, the court has little doubt viewers would understand Mr. Dreaming Bear's message of pride and cultural affinity.  The court also notes Mr. Dreaming Bear does not wear traditional Lakota clothing to school on a daily basis.  His appearance in such dress at the graduation proceedings certainly underscores the significance and uniqueness of the event.  Accordingly, the court finds Mr. Dreaming Bear has met his burden under <u>Johnson</u> and <u>Spence</u> of demonstrating his conduct is the type of expressive speech that falls under the umbrella of the Free Speech Clause of the First Amendment.  The court now turns to the issue of whether the school board's cap and gown policy unconstitutionally infringes on this protected speech.

**2.      Whether the School Board's Policy Impermissibly Denies**

**Mr. Dreaming Bear the Protections of the First Amendment**

**a.      Case Law on the Regulation of Student Expression**

The court is cognizant of the need to tread carefully in the realm of school policy.  Federal courts should refrain from interfering with the decisions of school authorities.  <u>East Hartford Ed. Ass'n</u>, 562 F.2d at 857.  Judicial interference in the operation of public schools requires "care and restraint."

Epperson v. State of Ark., 393 U.S. 97, 104 (1968).  "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."  Id.

Courts interfering in the operation of a public school must balance the interest in protecting students' First Amendment rights with the equally important interest in allowing school administrators to regulate student affairs.  The " 'vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' "  Epperson, 393 U.S. at 104 (quoting Shelton v. Tucker, 364 U.S. 479, 487 (1960)).  Courts "have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief."  Id.

The Supreme Court has made it clear students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  Tinker, 393 U.S. at 506.  "They cannot be punished merely for expressing their personal views on the school premises–whether 'in the cafeteria, or on the playing field, or on the campus during the authorized hours'–unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.' "  Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (quoting Tinker, 393 U.S. at 509, 512-13).

However, constitutional rights of students in public schools are not "automatically coextensive" with the rights of adults in non-school settings. Fraser, 478 U.S. at 683. The rights of students must be "applied in light of the special characteristics of the school environment[.]" Tinker, 393 U.S. at 506. "While certain forms of expressive conduct and speech are sheltered under the First Amendment, constitutional protection is not absolute, especially in the public school setting. Educators have an essential role in regulating school affairs and establishing appropriate standards of conduct." Canady, 240 F.3d at 441 (citing Fraser, 478 U.S. at 681). "A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." Hazelwood, 484 U.S. at 266 (quoting Fraser, 478 U.S. at 685). It is the school board, not the federal court, that should make the determination as to what constitutes appropriate behavior and dress in public schools. Id. at 267. It is with this understanding the court considers Mr. Dreaming Bear's First Amendment claim.

The Supreme Court has determined three levels of scrutiny courts should apply to regulation of student speech. Canady, 240 F.3d at 441-42. When determining the appropriate level of scrutiny, courts should examine the substance of the message, the purpose of the regulation, and the manner in which the message is conveyed. Id. at 441 & 441 n. 4 (collecting Supreme Court cases). Regardless of which level of scrutiny applies, the Constitution does not compel " 'teachers, parents, and elected school officials to surrender

control of the American public school system to public school students.' "
Fraser, 478 U.S. at 686 (quoting Tinker, 393 U.S. at 526).

The first category is represented by Tinker, which involved school regulations directed at specific student viewpoints. 393 U.S. 503. In that case, school officials suspended students for wearing black armbands in protest of the Vietnam War. Id. at 508. The Supreme Court held this type of speech, akin to "pure speech," may only be prohibited if it causes a substantial and material disruption in the school's operation. Id. at 509. The second category is represented by Fraser, which involved the regulation of lewd, vulgar, obscene, or plainly offensive speech. 478 U.S. 675. There, school officials suspended a student for delivering a nomination speech at a school assembly because the speech contained sexually explicit metaphors that the school deemed inappropriate for the members of the audience. Id. at 677-79. The Court held this type of speech may be prohibited because it was "wholly inconsistent with the 'fundamental values' of public school education." Id. at 685-86. The third category is represented by Hazelwood, which involved regulation of student expression within the context of school-sponsored activities. 484 U.S. 260. It is within this category Mr. Dreaming Bear's case lies.

In Hazelwood, the court considered a First Amendment challenge to the decision of school officials to delete two pages from the school newspaper. 484 U.S. at 260. The pages included articles on teen pregnancy and the impact of divorce on students. Id. Former high school students who were staff members

of the newspaper filed suit against the school district and school officials alleging a violation of their First Amendment rights. Id. The newspaper was written and edited by a journalism class as part of the school's curriculum. Id.

The Court first determined the newspaper was not a public forum for public expression. Id. at 267. The newspaper was not open for indiscriminate use by the general public or by some segment of the public, including student organizations. Id. School officials did not evince, by policy or practice, any intent to open the pages of the newspaper to indiscriminate use by student writers, editors, or even the student body. Id. at 269. Rather, officials reserved the newspaper for its intended purpose, "as a supervised learning experience for journalism students." Id. As a learning experience and as a means to teach leadership skills, students were allowed some authority over the contents of the newspaper. Id. at 269-70. Yet, the school did not relinquish ultimate control over the newspaper. Id. at 270. Because the newspaper was not a public forum, school officials "were entitled to regulate the . . . contents [of the newspaper] in any reasonable manner." Id.

The Court provided a detailed analysis distinguishing the Hazelwood case from its holding in Tinker. Id. at 271-72. The Court's reasoning is significant to the resolution of Mr. Dreaming Bear's claim.

> The question whether the First Amendment requires a school to tolerate particular student speech-the question that we addressed in Tinker-is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over

school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. . . . A school must be able to set high standards for the student speech that is disseminated under its auspices . . . and may refuse to disseminate student speech that does not meet those standards. . . . Otherwise, the schools would be unduly constrained from fulfilling their role as "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment."

Id. at 270-72 (internal citations omitted).

The Court concluded the standard articulated in Tinker, used when determining when a school may punish student expression, was not the same standard to be used when determining when a school may refuse to lend its name and resources to the dissemination of student expression. Id. at 272. Importantly, the Court held "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities *so long as their actions are reasonably related to legitimate pedagogical concerns*." Id. at 273 (emphasis added). "It is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational

27

purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights." Id. (internal citation, quotation marks, and footnote omitted).

The Court found school officials acted reasonably in deleting two pages of the newspaper. Id. at 274. The school was not unreasonable in concluding the articles were unsuitable for publication. Id. The need to protect the privacy of individuals featured in the articles was not unreasonable. Id. Thus, the Court concluded the students' First Amendment rights were not violated. Id. at 276.

In Henerey ex rel. Henerey v. City of St. Charles, School Dist., 200 F.3d 1128 (8th Cir. 1999), the Court of Appeals for the Eighth Circuit considered whether school officials could regulate student speech during an election campaign for student council. Id. at 1131. The principal of the school disqualified a student candidate for distributing, without obtaining prior approval, inappropriate materials as part of his campaign strategy. Id.

The court distinguished its case from those cases involving "[p]urely individual speech by students constituting 'personal expression that happens to occur on the school premises[.]'" Id. at 1132 (quoting Hazelwood, 484 U.S. at 271). This latter type of speech was subject to a high degree of First Amendment protection. Id. (citing Hazelwood, 484 U.S. at 276).

Like the Court in Hazelwood, the Eighth Circuit found the election campaign was not open to the public and, thus, was not a public forum. Id. at 1133. The court further found the student's expression was school-sponsored speech, not independent speech, because it was uttered during participation in

a school-sponsored activity where " 'students, parents, and members of the public might reasonably perceive [the school-sponsored speech] to bear the imprimatur of the school.' " Id. (quoting Hazelwood, 484 U.S. at 270-71). In such cases, the court reasoned a school might exercise greater control to assure " 'that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.' " Id. (quoting Hazelwood, 484 U.S. at 271). "Although to be considered 'school-sponsored,' expressive activities must be 'curricular' in a broad sense, they need not 'occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.' " Id. (quoting Hazelwood, 484 U.S. at 271). The court's discussion on this point is instructive:

> The election was supervised by a school administrator serving as the student council advisor, and it ran for a limited time period set by the school. It was operated under the auspices of the school administration, and any member of the public could reasonably have concluded that campaign materials were distributed with the implied approval of the school. Moreover, the election was conducted for the pedagogical purposes of allowing candidates to learn leadership skills and exposing the general student body to the democratic process. Accordingly, we agree with the district court that the election was a school-sponsored activity that was a part of the school's curriculum.

Id. The court concluded the school district's decision to disqualify the student was reasonably related to legitimate pedagogical concerns and its educational mission. Id. at 1136.

### b. Application to Mr. Dreaming Bear's Case

Neither party suggests Mr. Dreaming Bear's desired conduct is in any way lewd, offensive, or inappropriate. Indeed, his strong belief in the value of his culture is admirable. Mr. Dreaming Bear errs, however, in his belief that the graduation event is an opportunity for students to do what they will. The graduation proceeding is a school-sponsored event, and, thus, the students' speech, including that of Mr. Dreaming Bear, is school-sponsored speech. It is true the school board allowed the students great input in planning the festivities. Yet, it is a far stretch to say the school board relinquished or evinced an intent to relinquish ultimate control over the content and orderly progression of the proceedings. Clearly, the graduation exercises are not a public forum open to public expression of speech.

A graduation proceeding is a theatrical production in a sense–the actors, director, and stage crew, or rather the students, administrators, teachers, and staff members, hope to convey a message the audience will understand and appreciate. This is not a case where Mr. Dreaming Bear's speech *happens* to occur in a school setting as in <u>Tinker</u>. Rather, it is the school-sponsored event–the graduation exercises–which provide the forum and opportunity for Mr. Dreaming Bear's speech. This speech would occur during a school-sponsored activity that "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." <u>Hazelwood</u>, 484

U.S. at 271. This fact places Mr. Dreaming Bear's case squarely within the

scrutiny standard of <u>Hazelwood</u>.[8]

The school board may restrict school-sponsored speech, including

Mr. Dreaming Bear's speech, if the restriction is reasonably related to

legitimate educational concerns. <u>Id.</u> at 273. The school board has a legitimate

interest in honoring its graduating seniors and preserving the unity of the class

at this most auspicious event. Dr. Jaske aptly described this interest:

> Receiving a diploma in cap and gown; sitting as a class in cap and
> gown (at least for part of the program) symbolizes the unity of the
> school graduating class; their journey together through years of
> learning at the school. It is a visible reminder and affirmation that
> they are a high school graduation class. The cap and gown symbolize
> achievement in education and learning–the focus of the graduation

---

[8]In cases involving First Amendment challenges to school dress codes,
courts have applied a fourth category of scrutiny when (1) choice of clothing is
a personal expression that happens to occur on the school premises and (2) the
uniform policy is unrelated to any viewpoint. <u>Canady</u>, 240 F.3d at 443. The
"traditional time, place and manner analysis and the <i>O'Brien</i> test for expressive
conduct" should be used to assess the validity of a school uniform policy. <u>Id.</u>
Thus, "the School Board's uniform policy will pass constitutional scrutiny if it
furthers an important or substantial government interest; if the interest is
unrelated to the suppression of student expression; and if the incidental
restrictions on First Amendment activities are no more than is necessary to
facilitate that interest." <u>Id.</u> (citing <u>O'Brien</u>, 391 U.S. at 377); <u>see also</u> <u>Blau</u>, 401
F.3d at 391 (considering a First Amendment challenge to a school dress code
under the <u>O'Brien</u> test). Even under this level of scrutiny, the school board's
cap and gown policy passes constitutional muster. The school board has an
important interest in maintaining control over the graduation proceedings, in
honoring its students in a universally-accepted way, and in expressing
messages that promote the school's mission and goals. Further, the cap and
gown policy is unrelated to the suppression of student speech. Rather, the cap
and gown is a universal symbol of academic excellence. Finally, the restriction
on student expression is no more than necessary to facilitate the school board's
interest. The school board is requiring students to wear a cap and gown for
only approximately 30 minutes–just during the walk across the stage to receive
their diploma.

ceremony itself.  Finally, it is an acknowledgment of the degree, the high school diploma, which they all are receiving together as a class.

(Docket 21, Exhibit A at ¶ 7).

The school board has a legitimate interest in ensuring that the graduation exercises convey, to the student body, teachers, staff, and family members, messages that advance the mission and goals of the school.  The graduation proceedings celebrate not only the students' achievements, but also the school's achievement as an institution of learning and the teachers' and administrators' achievements as educators.  If the school board were to allow students to do what they wish at graduation, even if the students' activities were exemplary, the messages advanced by the proceedings may become diluted.  Obviously, the proceedings in and of themselves have meaning, otherwise the school would mail the students their diplomas without any fanfare.  However, the school board has invested much time and resources in creating an atmosphere of celebration.  The message is clear that a student's hard work and dedication will be rewarded.  The school board's interest in the graduation exercises and in the messages the festivities convey cannot be fairly disputed.

Requiring students to wear a cap and gown while receiving their diploma is reasonably related to the school board's legitimate interest.  Mr. Dreaming Bear acknowledged the cap and gown is a universal symbol of achievement and honor in the academic world.  As Dr. Jaske stated, "The cap and gown is tied to the tradition of American learning-white, Native, Hispanic, African-American, Asian and other cultures as well.  It is worn in high schools and colleges

throughout the US symbolizing learning and achievement without regard to culture or race." (Docket 21, Exhibit A at ¶ 8). The school board is requiring all seniors to wear their cap and gown over their traditional Lakota clothing for a brief period of time, indeed, just enough time to receive their diploma and exit the stage. This requirement furthers the school board's interest in demonstrating the unity of the class and celebrating academic achievement. It is important to note not all of the audience members will be Lakota or will understand the significance of Mr. Dreaming Bear's traditional Lakota clothing. The cap and gown, however, is a universally recognized symbol. The court finds the school board's cap and gown policy is reasonably related to its legitimate interest in controlling the content of the graduation exercises.

Accordingly, it is unlikely Mr. Dreaming Bear will succeed on the merits of his First Amendment claim. The court now turns to the other Dataphase factors to be considered when determining whether to grant preliminary injunctive relief.

**B.     The Threat of Irreparable Harm to the Movant**

As a preliminary matter, the court notes the burden is on Mr. Dreaming Bear as the movant to show the threat of irreparable harm. Dataphase, 640 F.2d at 114 n. 9.

The court recognizes Mr. Dreaming Bear's graduation is very important to him as it is to all graduating students. Graduation represents a milestone achievement in the life of a young person. Further, Mr. Dreaming Bear's desire to honor his people and heritage is no small matter. Yet, the school board is

not preventing Mr. Dreaming Bear from wearing his traditional Lakota clothing. Indeed, the school board is encouraging and actively promoting the celebration of Lakota culture by hosting feather and plume and star quilt ceremonies. When asked whether these efforts changed his position, Mr. Dreaming Bear indicated they did not, but he could not clearly articulate why. Mr. Dreaming Bear's response was that the graduation proceedings were for the students and he should be allowed to wear the clothing of his choice. However, Mr. Dreaming Bear *is* allowed to wear the clothing of his choice–the school board is merely asking all students to uphold the time-honored tradition of wearing a cap and gown for the brief time it takes to receive their diploma. Mr. Dreaming Bear acknowledged the cap and gown were universal symbols of achievement. The school board's cap and gown policy is designed to honor students, not detract from their graduation experience. The court cannot see how the school board's action will cause Mr. Dreaming Bear irreparable harm, nor could Mr. Dreaming Bear articulate a clear threat of harm.

## C.    The State of Balance

Under Dataphase, the court must consider the state of balance between the harm to the movant and the injury that granting the injunction will inflict on other parties to the litigation. 640 F.2d at 113. "[T]he balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405, 1436 (N.D. Iowa 1996) (citing Dataphase Systems, Inc., 640 F.2d at 114).

The court finds this factor weighs in favor of the school board. Mr. Dreaming Bear is seeking a preliminary and permanent injunction preventing the school board from requiring him and other Lakota students now and in the future from wearing caps and gowns. Mr. Dreaming Bear's request is expansive. Nine out of ten graduating seniors in 2010 are Lakota. It is unknown how many students in future graduating classes will be Lakota. An injunction could well force the cap and gown tradition into obscurity at Oelrichs High School.

In contrast, the harm to Mr. Dreaming Bear is minimized by the fact that the school board will feature prominently the Lakota culture at the graduation proceedings. The school board has incorporated significant Lakota ceremonies into the events and has encouraged Mr. Dreaming Bear and other students to wear traditional Lakota clothing and regalia. Thus, the school board has provided Mr. Dreaming Bear with the means to openly honor his people and culture. On the other hand, granting the injunction would deprive the school board of the right to regulate its own school-sponsored events. The court finds the balance of harm weighs on the side of the school board.

**D.     The Public Interest**

The court finds the public interest weighs in favor of the school board. Graduation exercises are important not only to the students but also to schools, communities, families, and the public. The tradition of the cap and gown is time-honored and is part of the very fabric of the academic experience throughout the nation. The public expects regularity and solemnity in

graduation proceedings.  To surrender control of graduation proceedings to students runs the risk of undermining the high standards the public expects.

## CONCLUSION

The court finds Mr. Dreaming Bear cannot make the necessary showing under <u>Dataphase</u> that preliminary injunctive relief should issue.  Because the court declines to issue a preliminary injunction, so too must it decline to issue a permanent injunction.  In accordance with the above discussion, it is hereby

ORDERED that Mr. Dreaming Bear's motion for preliminary and permanent injunction (Docket 5) is denied.

IT IS FURTHER ORDERED that Mr. Dreaming Bear's complaint (Docket 1) is dismissed.

Dated May 18, 2010.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE